UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

_____
                                                  )
WILDEARTH GUARDIANS,               )
                                                  )
         Plaintiff,                       )
                                                  )
       v.                             )     Civ. No. 1:14-cv-00112-RJ-CG
                                                  )
UNITED STATES OFFICE OF SURFACE  )
MINING RECLAMATION AND             )
ENFORCEMENT *et al.*,                    )
                                                  )
         Federal Defendants,        )
                                                  )
     and                                )
                                                  )
SAN JUAN COAL COMPANY,            )
                                                  )
         Defendant-Intervenor.      )
_____)

**FEDERAL DEFENDANTS' MOTION FOR
VOLUNTARY REMAND AND MEMORANDUM IN SUPPORT**

      The Office of Surface Mining Reclamation and Enforcement ("OSMRE"), an agency of the United States Department of the Interior ("Interior"), and the federal officials named as defendants (collectively, "Federal Defendants"), hereby move the Court to enter an order remanding this matter to OSMRE, so that it may conduct further environmental analysis under the National Environmental Policy Act ("NEPA").

## INTRODUCTION

      This case involves a challenge by Plaintiff WildEarth Guardians to the 2008 approval by the Assistant Secretary for Land and Minerals Management of a federal mining plan

1

modification for what is known as the "Deep Lease Extension" at the San Juan Mine. Plaintiff challenges the adequacy of OSMRE's environmental analysis under NEPA and the public participation allowed during agency proceedings. While the merits have been fully briefed by the parties, Federal Defendants have determined, based on recent rulings in similar mining plan challenges in Colorado and Montana, that remand is appropriate to allow the agency to conduct a new environmental analysis of project impacts.

In particular, OSMRE proposes to prepare an environmental impact statement ("EIS") that rigorously analyzes the reasonably foreseeable impacts of the mining plan approval. This would include examination of air quality impacts, the resource of greatest apparent concern to Plaintiff, based on the Amended Complaint. ECF No. 37. This proposed remedy would also address Plaintiff's public participation concerns by allowing multiple opportunities for public participation in development of the EIS. OSMRE estimates that it will complete the NEPA process and publish a final EIS within three years.

Under the terms proposed herein, the Assistant Secretary's decision approving the mining plan modification would remain in effect and mining operations would continue during development of the EIS. This will avoid adverse work force impacts and revenue disruptions affecting the State of New Mexico and the federal government and is consistent with the remedy rulings of the Districts of Colorado and Montana in the noted mining plan challenges. *See WildEarth Guardians v. OSMRE*, 104 F. Supp. 3d 1208 (D. Colo. 2015) ("*Guardians I*"); *WildEarth Guardians v. OSMRE*, Nos. CV14-13-BLG-SPW, CV14-103-BLG-SPW, 2016 WL 259285 (D. Mont. Jan. 21, 2016) ("*Guardians II*"). As further explained below, keeping the current mining plan decision in force will also avoid operational inefficiencies and safety

concerns for the owner and operator of the mine, that is, the San Juan Coal Company ("SJCC"), Defendant-Intervenor in this action.

SJCC concurs in this request and is contemporaneously filing a joinder to this motion ("SJCC Joinder"), accompanied by the declaration of an SJCC official explaining the operational and safety concerns. Plaintiff has advised undersigned counsel that it takes no position on this motion and reserves the right to file a response.

## FACTUAL AND PROCEDURAL BACKGROUND

**1. The San Juan Mine**

As detailed in Federal Defendants' response to Plaintiff's opening merits brief, ECF No. 53 at 6-10, the San Juan Mine is an underground coal mine on federal, state, and private leases located about fifteen miles from Farmington, in San Juan County, New Mexico. *See* Administrative Record ("AR") 24. Surface mining operations commenced there in 1973, and the mine converted to underground operations in 2001. *Id.* SJCC's current operations involve the extraction of coal from two underground leases: (1) federal coal lease NM-028093 dated March 20, 1980 ("Lease No. 1"); and (2) federal coal lease NM-99144 dated March 1, 2001 ("Lease No. 2"). *See* Declaration of Jeffrey Kukura ¶ 11 ("Kukura Decl.") (Ex. 1 to the SJCC Joinder). SJCC commenced mining of Lease No. 2 in June 2008. *Id.* ¶ 11. Plaintiff challenges the mining plan approval associated with Lease No. 2, but considerations of safety and operational efficiency involving Lease No. 1 are relevant to the terms of remand proposed herein, as explained below.

The San Juan Mine is the exclusive coal source for the nearby San Juan Generating Station -- a 1,683 megawatt power plant -- which supplies electricity for approximately two million customers in New Mexico, Arizona, Colorado, Utah, and Southern California. *See id.*

¶ 10; AR2553 (discussing coal supply for San Juan Generating Station).  The San Juan Mine employs members of the local community and generates a significant source of revenue for the federal and state government in the form of royalties and income taxes.  Kukura Decl. ¶ 8, AR1495, AR6063 (indicating an 8% royalty rate).  The mine currently employs 348 hourly employees and 108 salaried employees.  *Id*. ¶ 9.  For every San Juan Mine employee, an estimated two to four employees of contractors, vendors and other service providers support the San Juan Mine in the local economy.  *Id*.

   2. **BLM Lease Approval**

On July 22, 1997, SJCC submitted a lease application to the Bureau of Land Management ("BLM") seeking an additional 4,500-acre tract of underground federal coal, known as the "Deep Lease Extension" and referred to herein as Lease No. 2.  AR4362-68.  As part of its analysis regarding whether to conduct a lease sale, BLM prepared an environmental assessment (the "1998 EA") to analyze impacts associated with leasing this additional tract of coal.  AR4360-4404.   At the conclusion of its environmental and regulatory review, BLM decided to offer Lease No. 2 for sale and SJCC was the successful high bidder.  *See* Notice of Coal Lease Offering, 64 Fed. Reg. 69023 (Dec. 9, 1999); Notice of Coal Lease Offering, 65 Fed. Reg. 24499 (Apr. 6, 1999).  BLM issued Lease No. 2 to SJCC on March 1, 2001.  AR6063-65.

   3. **New Mexico MMD Permit Approval**

Concurrent with the federal coal leasing process, SJCC sought to obtain the appropriate state permits and approvals from the State of New Mexico Mining and Minerals Division ("MMD").  As Federal Defendants explain in their responding merits brief, ECF No. 53 at 4, the State of New Mexico has assumed federally-delegated regulatory authority to issue surface mining permits on federal lands pursuant to the Surface Mining Control and Reclamation Act

("SMCRA").[1]  30 U.S.C. § 1273(c); *see also* 30 C.F.R. § 931.30 (codification of Federal-State Cooperative Agreement delegating SMCRA permitting authority to New Mexico).  The mine permit issued by the State contains detailed information regarding the proposed mining operations, including measures to minimize environmental impacts.

On January 22, 1998, SJCC submitted a comprehensive permit application package ("PAP") to MMD seeking a permit revision for operations within Lease No. 1 and Lease No. 2. AR24.  The revision would also address the San Juan Mine's transition from surface mining to underground mining.  *Id*.  Among other things, SJCC included an air quality management plan for MMD's approval.  AR2560-62.  On October 22, 1999, MMD approved the PAP and issued the permit revision to SJCC authorizing underground mining operations within the two leases. AR6500-12.  MMD issued a permit revision to SJCC on March 22, 2004.  AR6372.

### 4. OSMRE Mining Plan Modification Approval

In this case, the revisions to the state-issued surface mining permit for operations within Lease No. 1 and Lease No. 2 were significant enough to warrant a modification of the federal mining plan, as required by Mineral Leasing Act regulations.  *See* 30 C.F.R. § 746.11(a).  On January 11, 2001, the Assistant Secretary approved a modification of the mining plan for Lease No. 1 ("Mining Plan Modification No. 1"), based upon OSMRE's recommendation.  AR7530. Mining Plan Modification No. 1 amended the original mining plan for the San Juan Mine, approved on August 13, 1984, by converting from surface to underground mining and adding 54.3 million tons of recoverable coal reserves within Lease No. 1.  AR5883-85.

---

[1] Underground mines are regulated under SMCRA as well.  *See, e.g.*, 30 U.S.C. § 1291(28)(a) (defining "surface coal mining operations" to include "surface impacts incident to an underground coal mine").

For the next several years, SJCC worked with oil and gas lessees to resolve conflicts regarding oil and gas interests near Lease No. 1 and Lease No. 2. Kukura Decl. ¶ 13. Once those conflicts were resolved, the State submitted to OSMRE a proposed mining plan modification for Lease No. 2 ("Mining Plan Modification No. 2" or "Deep Lease Extension"). The modification addressed recovery of approximately 36.6 million tons of federal coal from Lease No. 2. AR25. Under Mining Plan Modification No. 2, there would be no additional surface disturbance, nor any increase in the annual rate of coal production. *Id*.

In undertaking its NEPA obligations for Mining Plan Modification No. 2, OSMRE relied principally on the analysis contained in BLM's 1998 EA, in which OSMRE participated as a cooperating agency. Based upon its review -- and its reasonable anticipation that the State of New Mexico would fulfill its duties to correctly enforce applicable law -- OSMRE concluded that Mining Plan Modification No. 2 would not result in significant impacts and, on November 19, 2007, issued a finding of no significant impact. AR11. On January 7, 2008, OSMRE recommended that the Assistant Secretary approve Mining Plan Modification No. 2. AR3. On January 17, 2008, the Assistant Secretary did so. AR2.

**5. Plaintiff's Challenge to the Mining Plan Modification**

Five years later, in February 2013, Plaintiff brought suit in the United States District Court for the District of Colorado challenging OSMRE's approval of mining plan modifications for seven different mines located in four states, including a challenge to Mining Plan Modification No. 2.[2] On February 7, 2014, the District of Colorado granted motions filed by

---

[2] The other challenged mining plan approvals involved the Colowyo Mine and the Trapper Mine in Colorado, the Spring Creek Mine in Montana, and the School Creek, Black Thunder, and Cordero Rojo Mines in Wyoming.

Federal Defendants and SJCC requesting that the out-of-state claims be severed and transferred to the judicial districts of mine location. ECF No. 32. On March 14, 2014, Plaintiff filed in this Court a pleading styled as an Amended Petition for Review of Agency Action, limiting its challenge to Mining Plan Modification No. 2. ECF No. 37.

In particular, Plaintiff claims Mining Plan Modification No. 2 violates NEPA because OSMRE allegedly: (1) failed to provide adequate public notice and participation related to the Mining Plan Modification No. 2; and (2) failed to consider the direct and indirect air quality impacts of the modification. Federal Defendants and SJCC disputed Plaintiff's claims, asserted legal defenses, and challenged the adequacy of Plaintiff's standing declarations, intended to demonstrate the Court's subject matter jurisdiction.

Since briefing concluded in December 2014, the parties have engaged in three rounds of settlement discussions. On April 1, 2016, a stay of proceedings sought by the parties to facilitate such discussions and authorized by the Court on February 10, 2016, expired. *See* ECF No. 86.

## ARGUMENT

**I.     The Court Should Remand the Decision Approving Mining Plan Modification No. 2.**

Courts have long recognized the propriety of voluntarily remanding a challenged agency action without judicial consideration of the merits, with or without admission of agency error. *See Carpenters Indus. Council v. Salazar*, 734 F. Supp. 2d 126, 132 (D.D.C. 2010). As the Tenth Circuit has explained, agencies have the "inherent authority" to reconsider their own decisions, "since the power to decide in the first instance carries with it the power to reconsider." *Trujillo v. Gen. Elec. Co.,* 621 F.2d 1084, 1086 (10th Cir. 1980), citing *Albertson v. Fed. Commc'ns Comm'n*, 182 F.2d 397, 399 (D.C. Cir. 1950); *see also Coal. of Ariz./N.M. Ctys. for Stable Econ. Growth v. Salazar*, No. 07-cv-00876 JEC/WPL, 2009 WL 8691098, at *3 (D. N.M.

May 4, 2009) (J. Conway) (same). In fact, federal courts "commonly grant agency motions for voluntary remand." *Id.* (internal quotation marks and citation omitted). Further, a motion for remand is the appropriate procedure when an agency seeks to reconsider its action. *See Anchor Line Ltd. v. Fed. Maritime Comm'n*, 299 F.2d 124, 125 (D.C. Cir. 1962) (stating that an agency intent on reconsidering its decision "should move the court to remand or to hold the case in abeyance pending reconsideration by the agency"), *cert. denied*, 370 U.S. 922 (1962).

A number of cases make clear that an agency need not confess error in seeking remand. *SKF USA, Inc. v. United States*, 254 F.3d 1022, 1029 (Fed. Cir. 2001); *accord Ethyl Corp. v. Browner*, 989 F.2d 522, 524 (D.C. Cir. 1993) (same); *Citizens Against Pellissippi Parkway Extension, Inc. v. Mineta* ("*Pellissippi Parkway*"), 375 F.3d 412, 417 (6th Cir. 2004). Other decisions make clear that courts have "considerable discretion in determining whether remand is appropriate if the agency has raised a substantial and legitimate concern in support of their request for a remand." *Ctr. For Native Ecosystems v. Salazar*, 795 F. Supp. 2d 1236, 1239 (D. Colo. 2011), citing *Carpenters Indus. Council*, 734 F.Supp.2d at 132, *Sierra Club v. Antwerp*, 560 F.Supp.2d 21, 23 (D.D.C.2008). This deference to agency preference encourages agencies "to cure their own mistakes rather than wasting the courts' and the parties' resources" by continuing to litigate matters to ultimate conclusion. *Ethyl Corp.*, 989 F.2d at 524 (footnote omitted).

In the present case, Federal Defendants have determined that a remand is appropriate to further analyze the impacts of Mining Plan Modification No. 2. As noted, this determination is informed in part by recent rulings by the Districts of Colorado and Montana on the merits of Plaintiff's similar mining plan challenges. In both instances, the courts found NEPA violations,

including violations with respect to public participation. *Guardians I*, 104 F. Supp. 3d 1208,[3] *Guardians II,* 2016 WL 259285. Although the cases involved different facts, different administrative records, and differing forms of NEPA compliance, in light of the courts' rulings and the public interest, and in the interest of good governance, Federal Defendants believe further NEPA review, with additional public participation, is appropriate.

Under the terms of the proposed remand, OSMRE will prepare an EIS that includes analysis of the reasonably foreseeable air quality impacts related to Mining Plan Modification No. 2, including the indirect impacts of coal combustion from the San Juan Generating Station. In addition, OSMRE will afford the public at least two opportunities to participate in the process: during the public scoping period and on a draft EIS. Given the broad scope of analysis and the rigors entailed in preparing an EIS, as well as the need to allow time for public participation and response to public comments, OSMRE estimates that it will need three years to complete its additional NEPA review and complete necessary consultation with the Fish and Wildlife Service for purposes of the Endangered Species Act. This is a reasonable time period for these activities. OSMRE recently completed a similar EIS for the nearby Navajo Mine and Four Corners Power Plant. For that project, it took OSMRE almost three years to the day from the notice of public scoping to the issuance of the Record of Decision for the final EIS.[4] Further, a 2014

---

[3] On appeal, the Tenth Circuit vacated the district court judgment for mootness, *see WildEarth Guardians v. OSMRE*, Nos. 15-1186, 2016 WL 3410216, at *2 (10th Cir. Jun. 17, 2016), explaining that the agency's actions in completing additional NEPA analysis pursuant to the district court's remedy order and issuing new decisions (while the appeal was pending) mooted any challenge to the prior approvals, which were superseded and no longer in force. *Id*. at *1.

[4] *See* Notice of Intent To Initiate Public Scoping and Prepare an EIS for the Four Corners Power Plant and Navajo Mine Energy Project, 77 Fed. Reg. 42329 (Jul. 18, 2012): and Final Four Corners Power Plant and Navajo Mine Energy Project -- Record of Decision, 80 Fed. Reg. 43116 (Jul. 21, 2015).

Government Accountability Office (GAO) Report found that the average length of time for completing an EIS in 2012 is 4.6 years.  *See* GAO-14-369, "National Environmental Policy Act - - Little Information Exists on NEPA Analyses," (April 2014) (http://www.gao.gov/assets/670/662543.pdf).

One additional consideration weighs in favor of remand for additional study.  As Plaintiff notes, NEPA is our nation's "basic national charter for protection of the environment." Am. Compl. ¶ 20, ECF No. 37 (quoting 40 C.F.R. § 1500.1(a)), and the "centerpiece of environmental regulation in the United States."  Pls.' Opening Br. 3, ECF No. 48 (quoting 40 C.F.R. § 1500.1). Consistent with these precepts, Federal Defendants note that voluntary remand would serve the public interest because, as the Sixth Circuit has explained, an agency's "reconsideration of the potential environmental impacts of a project furthers the purpose of NEPA."  *Pellissippi Parkway*, 375 F.3d at 418.  Here, additional analysis and public input would advance the "twin aims" of NEPA, that is, facilitating informed agency decisionmaking and promoting public involvement.  *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 703 (10th Cir. 2009) (quoting *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97 (1983)).

For these reasons, the Court should exercise its inherent authority to manage its docket and its equitable power to grant remand, without need to make determinations on the merits or rule on the legal defenses asserted.  This will avoid the need to resolve issues through litigation that may be resolved upon remand and further study.  If, after the EIS is completed and the agency reaches a new decision, Plaintiff believes the analysis is inadequate, it may seek judicial review.

**II.     The Court Should Maintain the Status Quo During Remand**

Pending additional NEPA review, Mining Plan Modification No. 2 should remain in full force and effect.  In issuing a remand, courts retain discretion to fashion appropriate remedies, while taking into account principles of equity.  *See, e.g.*, 5 U.S.C. § 702 (nothing in the Administrative Procedure Act affects "the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground").  As noted, the Court has the authority to remand without vacatur and without a determination on the merits.  *Coal. of Ariz./New Mexico Ctys.*, 2009 WL 8691098, at *3.  In deciding whether to vacate, courts employ a balancing test to weigh the "the seriousness of the [underlying decision's] deficiencies" with "the disruptive consequences of an interim change that may itself be changed."  *Id*. at *9 (internal quotation marks and citation omitted); *Guardians I*, 104 F. Supp. 3d at 1231-32 (same).  On numerous occasions, courts have allowed the continued implementation of an activity authorized by agency action even while the agency reconsiders its action on remand.  *See, e.g., Guardians I*, 104 F. Supp. 3d at 1232 (declining to vacate mining plan approval during period of corrective NEPA analysis); *Guardians II*, 2016 WL 259285 at *3 (same); *Cook Inletkeeper v. EPA*, 400 F. A'ppx. 239, 241 (9th Cir. 2010) (allowing continued operation of natural gas and oil extraction facilities under challenged wastewater discharge permit during voluntary remand of the challenged permit); *Def. of Wildlife v. Jackson*, 791 F.Supp.2d 96, 118-19 (D.D.C. 2011) (declining to vacate an EPA-approved pesticide registration because vacatur "would punish [the pesticide manufacturer] for following the Agency's directions").

In this case, continuation of mining is appropriate because, as the SJCC Joinder and accompanying *Kukura* declaration explain in detail, vacatur would harm the public interest, and SJCC and its employees and contractors by effectively shutting down operations at the mine.

This is because Lease No. 1 cannot be economically mined without also mining Lease No. 2. *Kukura Decl.* ¶¶ 15-18.  Additionally, mining of Lease No. 1 alone raises certain safety concerns, for reasons explained by Mr. Kukura.  *See, e.g.*, *id.* ¶ 22.  Further, an order of vacatur would not serve the public interest because it is likely to cause job losses and disruption to the flow of royalty and income tax revenue for the State of New Mexico and royalty revenue for the Federal government.  *Id.* ¶ 8, 21; AR6063 (indicating an 8% royalty rate).

Given these considerations, the Court should conclude, as the Districts of Colorado and Montana did, that the consequences of vacatur outweigh the seriousness of the alleged NEPA deficiencies.  In the Colorado case, the court noted its duty to weigh agency error against "the disruptive consequences of an interim change that may itself be changed." *Guardians I*, 104 F. Supp. 3d at 1231 (citations omitted).  Based on this weighing, the court deferred an order of vacatur to allow for corrective NEPA analysis.  *Id.* at 1232.  The court cited the likelihood of mine shutdown, employee layoffs, economic losses to the mine operator, and hardship to the power plant "which depends on [the mine] as a principal source of coal." *Id.*

Likewise, in the Montana case, the district judge applied similar reasoning in adopting the magistrate judge's recommendation that vacatur be deferred to allow for NEPA review.  *See Guardians II*, 2016 WL 259285 at *3; *see also* WildEarth Guardians v. OSMRE, No. CV 14-13-BLG-SPW, 2015 WL 6442724, at *1 (D. Mont. Oct. 23, 2015) (magistrate judge's recommendation).  The recommendation noted that vacatur may (i) have "detrimental consequences for [the mine operator] and its employees, for the State of Montana, and for other agencies involved in [the] process;" (ii) disrupt ongoing reclamation efforts; and (iii) "result in duplication of efforts regarding the State permitting process, which was accomplished in what appears to be a correct and thorough manner, with proper notice." *Id.* at *9.  Given these

12

impacts, the magistrate judge concluded that "[e]quity warrants a decision to allow the [approved mining plan modification] to remain in force," while Federal Defendants correct the errors in their NEPA process.  *Id*.  Federal Defendants ask the Court to follow the example of the Districts of Colorado and Montana by declining to vacate the mining plan decision challenged in this case during the time it takes OSMRE to prepare the new NEPA document.

## CONCLUSION

Accordingly, Federal Defendants request that the Court, if it concludes that Plaintiff has standing and that subject matter jurisdiction therefore exists, enter an order that: (i) remands approval of Mining Plan Modification No. 2 to OSMRE for preparation of an EIS and new decision, to be completed within three years from the order's date; (ii) directs that Mining Plan Modification No. 2 remain in full force and effect during the period of remand; and (iii) dismisses this case without prejudice to refiling should OSMRE fail to timely prepare the EIS contemplated herein and issue a new decision.

Respectfully submitted, July 18, 2016,

        JOHN C. CRUDEN
        Assistant Attorney General
        U.S. Department of Justice
        Environment and Natural Resources Division

        /s/ John S. Most_____
        JOHN S. MOST
        Natural Resources Section
        P.O. Box 7611
        Washington, D.C. 20044-7611
        Phone:  (202) 616-3353
        Fax:  (202) 305-0506
        John.Most@usdoj.gov

        STEVEN C. YARBROUGH
        United States Attorney
        RUTH F. KEEGAN

                                Assistant U.S. Attorney
P.O. Box 607
Albuquerque, New Mexico 87103
Phone: (505) 346-7274
Ruth.F.Keegan@usdoj.gov

*Counsel for Federal Defendants*

## **CERTIFICATE OF SERVICE**

      I certify that a copy of the foregoing is being filed with the Clerk of the Court using the CM/ECF system, thereby serving it on all parties of record, this 18th day of July, 2016.

                                          /s/ John S. Most_____
                                          JOHN S. MOST
                                          U.S. Department of Justice